USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 03/28/2022

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- X
                                                         :
FUJIAN OCEAN SHIPPING CO. LTD.,                          :
individually and on behalf of M/V ZHENG RUN              :
(IMO No. 9593816), and M/V ZHENG RONG                    :
(IMO No. 9593828),                                       :
                                                         :
                                      Plaintiff,         :
                                                         :          16-CV-401 (VEC)
                     -against-                           :
                                                         :          OPINION & ORDER
O.W. BUNKER FAR EAST (S) PTE. LTD.,                      :
EQUATORIAL MARINE FUEL                                   :
MANAGEMENT SERVICES PTE LTD.,                            :
SINANJU MARINE SERVICES PTE LTD.,                        :
GLOBAL MARINE TRANSPORTATION PTE                         :
LTD., GLOBAL ENERGY TRADING PTE LTD.                     :
and ING BANK N.V.,                                       :
                                                         :
                                      Defendants.        :
-------------------------------------------------------- X

VALERIE CAPRONI, United States District Judge:

This litigation arises out of the November 2014 collapse and bankruptcy of O.W. Bunker

& Trading A/S and its subsidiaries (collectively, "O.W."), one of the world's largest suppliers of

maritime fuel or "bunkers."  In the years following O.W.'s collapse, more than two dozen

interpleader actions were instituted by vessel owners and charterers (the "vessel interests") that

had purchased fuel from O.W. prior to its collapse but had not yet paid for the fuel by the time

O.W. filed for bankruptcy protection.  The purpose of the interpleaders was to resolve competing

claims to payment on O.W.'s invoices from O.W.'s security agent, ING Bank N.V. ("ING"),

various O.W. entities, and the physical suppliers that actually supplied the fuel.[1]

--------

[1]      Many of the interpleader cases were assigned to the Undersigned as related cases.  This matter is the last
such case to remain pending before this Court.

In this action, vessel interest Fujian Ocean Shipping Co. Ltd. ("Fujian") filed an interpleader complaint related to the deliveries of bunkers in 2014 to two vessels: the M/V ZHENG RUN ("ZHENG RUN") and the M/V ZHENG RONG ("ZHENG RONG").  Fujian contracted with O.W. Bunker Far East (S) PTE. LTD. ("OWFE") for the supply of the bunkers, and OWFE subcontracted with local physical suppliers, including Global Energy Trading Pte Ltd. ("GET"), which delivered the fuel to the vessels.  OWFE and GET have not been paid for the bunkers that were delivered.

ING, as OWFE's security agent, asserted *in personam* contract claims against Fujian and *in rem* maritime lien claims against the vessels.  GET asserted claims against Fujian for conversion and unjust enrichment.  ING and GET cross-moved for summary judgment.  Fujian moved to be discharged from liability and for attorneys' fees and costs as a disinterested stakeholder.  For the following reasons, ING's motion for summary judgment is GRANTED; GET's motion for summary judgment is DENIED; and Fujian's motion for discharge and attorneys' fees and costs is GRANTED in part and DENIED in part.

## BACKGROUND

In August 2014, Fujian contracted with OWFE for the supply of bunkers to the ZHENG RUN.  Stip. Facts, Dkt. 62 ¶ 3.[2]  OWFE subcontracted with Equatorial Marine Fuel Management Services Pte Ltd ("Equatorial"), a local physical supplier, to deliver and supply the fuel to the ZHENG RUN.  *Id.* ¶ 8.  Equatorial delivered the bunkers to the vessel in the Port of Singapore on October 21, 2014.  *Id.* ¶ 16.  On the same day, OWFE issued an invoice to Fujian in the

---

[2]     The parties agreed to a statement of joint stipulated facts.  *See* Stip. Facts, Dkt. 62.  That statement replaces Rule 56.1 Statements traditionally filed concurrently with motions for summary judgment.

amount of $408,651.28, and Equatorial issued an invoice to OWFE in the amount of $405,228.74. *Id.* ¶¶ 17–18.  Neither invoice appears to have been paid. *Id.* ¶ 19.[3]

In November 2014, Fujian contracted with OWFE for the supply of bunkers to the ZHENG RONG. *Id.* ¶ 21.  OWFE subcontracted with Petrobras Singapore Private Ltd. ("Petrobras") and with GET, two local suppliers, to deliver and supply the fuel to the vessel. *Id.* ¶¶ 27, 29.[4]  Petrobras and GET supplied the bunkers to the ZHENG RONG in the Port of Singapore on November 4-5, 2014. *Id.* ¶ 45.  On November 4, 2014, OWFE issued an invoice to Fujian in the amount of $906,596.24, and GET issued an invoice to OWFE in the amount of $847,052.35. *Id.* ¶¶ 51–52.  On November 10, 2014, Petrobas issued an invoice to OWFE in the amount of $55,795.21. *Id.* ¶ 58.  It appears that none of the three invoices was paid. *Id.* ¶ 55–56.[5]

---

[3]    Equatorial has not appeared in this action.  Accordingly, the parties stipulated only that OWFE and its security agent ING have not been paid. *See* Stip. Facts, Dkt. 62 ¶ 19.  Although the parties have not stipulated as such, the Court has no reason to believe that Fujian or OWFE paid Equatorial for the bunkers.

[4]    Fujian did not name Petrobas as a Defendant in this action. *See* Compl., Dkt. 1 ¶¶ 2–7 (listing the Defendants).  In one of its legal briefs, Fujian reported that Sinanju Marine Services Pte Ltd. (and not Petrobas) was one of the local physical suppliers that refueled the ZHENG RONG.  Fujian Mem. of Law, Dkt. 69 at 2.  Sinanju Marine Services Pte Ltd ("Sinanju") is a Defendant in this action.  Compl. ¶ 4.  Although Fujian stipulated to the relevant facts, Sinanju is not referenced in the stipulation. *See generally* Stip. Facts, Dkt. 62.  Additionally, another physical supplier, Global Marine Transportation Lte Ltd. ("Global Marine"), appears to have delivered a relatively small amount of fuel to the ZHENG RONG on November 4, 2014. *Id.* ¶ 49.  Fujian did name Global Marine as a Defendant in this action.  Compl. ¶ 5.

       Although Fujian asked the Clerk of Court to issue summonses for all Defendants, *see* Summonses Issued, Dkt. 4, Fujian never filed proof of service as to Defendants Equatorial, Sinanju, and Global Marine, and it appears that they were never served. *See also* Fujian Mem. of Law, Dkt. 69 at 14 (noting that Fujian "expended efforts to provide notice . . . and to obtain [Defendants'] appearance in this action," without mentioning formal service).  Given Fujian's apparent lack of prosecution of its case against those three Defendants over the past seven years, including its failure to move for default judgments to be entered against them, Fujian's claims against Defendants Equatorial, Sinanju, and Global Marine are dismissed for failure to prosecute.  Accordingly, this Opinion has no res judicata effect on those Defendants were any one of them to bring separate claims for payment with respect to their alleged supply of bunkers to the ZHENG RUN or the ZHENG RONG in October or November 2014.

[5]    Because Petrobas is not a Defendant and has not appeared in this action, the parties stipulated only that OWFE, its security agent ING, and GET have not been paid. *See* Stip. Facts, Dkt. 62 ¶ 55–56.  As with Equatorial, although the parties did not stipulate as such, the Court has no reason to believe that Petrobas has been paid.

On November 5, 2014, O.W. Denmark announced that a fraud had been committed at its Singapore-based subsidiary with "potential loss of around USD 125 million," *see* Company Announcement, Dkt. 70-13; Stip. Facts, Dkt. 62 ¶ 62, and on November 7, 2014, O.W. filed for bankruptcy in Denmark, *see* Press Release, Dkt. 70-14 at 1; Stip. Facts, Dkt. 62 ¶ 61.[6] Following O.W.'s announcement of its financial troubles, physical suppliers all over the world who had provided bunkers on order of O.W. entities began to scramble to secure payments and to avoid being swept into O.W.'s bankruptcy. GET's strategy was somewhat unusual. On November 10, 2014, GET's attorneys sent a letter to Fujian and OWFE, invoking GET's terms and conditions of sales for marine fuel. *See* Stip. Facts, Dkt. 62 ¶¶ 64; Letter, Dkt. 70-15. The letter focused on the portion of GET's terms and conditions that provide: "[P]roperty in the Products shall not pass from the Seller to the Buyer until . . . the Seller received . . . payment for the Products" (the "Retention of Title clause"). GET Terms & Conditions, Dkt. 93-6 ¶¶ 12.2., 12.2.1.[7] Additionally, the letter put Fujian "on notice" that (a) GET owned the bunkers pursuant to the Retention of Title clause; (b) OW had "no title nor property in the said bunkers and are not entitled to nor capable of giving [Fujian] or any party good title;" (c) any party in possession of the bunkers is "required not to consume" them; (d) the bunkers must be delivered to GET "as soon as practicable;" (e) and any future consumption of the bunkers constituted wrongful conversion and would make Fujian liable for damages. Letter, Dkt. 70-15 at 2–3.[8]

---

[6]      OWFE commenced insolvency proceedings in Singapore on November 13, 2014. Stip. Facts., Dkt. 62 ¶ 67.

[7]      GET's terms and conditions were incorporated in the sales confirmations sent by GET to OWFE contemporaneously with the fuel deliveries. Stip. Facts, Dkt. 62 ¶¶ 34–36.

[8]      On November 12, 2014, GET's attorneys emailed Fujian's counsel for a second time, demanding that GET either (a) be given access to the ZHENG RONG to inspect the bunkers and arrange for their return or (b) be paid for the bunkers on agreed upon terms. Stip. Facts, Dkt. 62 ¶ 66; Email, Dkt. 70-17 at 1.

GET's November 10, 2014, letter was sent five days after the re-fueling had been completed and before the ZHENG RONG had consumed all of — or possibly any of — the fuel. According to the vessel's fuel reports, when the ZHENG RONG arrived in Indonesia on November 10, 2014, after having been refueled in Singapore five days earlier, it had used slightly less fuel than the amount of fuel that had been on board the vessel before the delivery of the bunkers that are at issue. *Compare* Pre-Load Plan, Dkt. 70-7 (indicating that on November 4, 2014, prior to the refueling, the vessel's had 130 metric tons of fuel in the relevant storage tank)[9] *with* Stip. Facts, Dkt. 62 ¶ 48 (noting that between November 5, 2014, and November 10, 2014, the vessel consumed between 107 and 119 metric tons of fuel).[10] Although on November 10, 2014, the ZHENG RONG had more fuel in its tanks than had been delivered by the physical suppliers, because the delivered fuel was commingled and is fungible, it is impossible to determine whether the fuel that had been consumed was the fuel that had been delivered by the various physical suppliers, the fuel that was already on board, or some mixture of the two. *See* Stip. Facts, Dkt. 62 ¶ 46. In any event, GET claims that the bunkers were neither returned nor paid for, *see* GET Mem. of Law, Dkt. 67 at 8; Stip. Facts, Dkt. 62 ¶ 55, and it appears that all of the bunkers at issue were subsequently consumed by the vessel.

About a year before the events at issue in this lawsuit, on December 19, 2013, O.W. and various lenders, including ING, entered into a credit agreement pursuant to which O.W. received

---

[9]    The Pre-Load Plan also reflects that other storage tanks contained minimal amounts of fuel. *See* Pre-Load Plan, Dkt. 70-7.

[10]    The stipulated facts state that the ZHENG RONG consumed 119 metric tons of high sulfur fuel oil ("HSFO") "from the time of the departure report at SINGAPORE on November 5, 2015 to the time of the arrival report at INDONESIA on November 10, 2014." Stip. Facts, Dkt. 62 ¶ 48. The next sentence states that the vessel consumed 107 metric tons of HSFO "from the time of completion of the bunker stem at 0100 local time on November 5, 2014 to the time of the vessel's noon report at 1200 local time on November 10, 2014." *Id.* Accordingly, the Court assumes that the vessel consumed between 107 and 119 metric tons of fuel between the refueling in Singapore and its arrival in Indonesia on November 10, 2014.

financing secured by its receivables.  Stip. Facts, Dkt. 62 ¶¶ 71–74.  Pursuant to a security

agreement, ING was assigned collateral on behalf of the lenders financing the credit agreement.

*Id.* ¶ 75.  When O.W. collapsed in November 2014, ING began attempting to collect the

receivables to recover the financing that had been extended pursuant to the credit agreement.  *Id.*

¶ 76.  The parties agree that the outstanding invoices relating to the fueling of the ZHENG RUN

and the ZHENG RONG are two of those assigned receivables.  *Id.*

Before Fujian filed its interpleader complaint in this action, ING and GET attempted to

collect the payments due from Fujian in other fora.  On July 14, 2015, ING served a notice of

arbitration in London against Fujian (the "London Arbitration").  Fujian Mem. of Law, Dkt. 69

at 2 (citing Watson Decl., Dkt. 36 ¶ 9).  On January 4, 2016, ING named Fujian as a Defendant

in a lawsuit filed in the Eastern District of Louisiana (the "Louisiana Action"), pursuant to Rule

B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of

Civil Procedure.[11]  And finally, on January 8, 2016, GET filed a writ of summons against Fujian

in the High Court of the Republic of Singapore (the "Singapore Action").  GET Mem. of Law,

Dkt. 67 at 8–9; Fujian Mem. of Law, Dkt. 69 at 2–3.

On January 19, 2016, while the London Arbitration, the Louisiana Action, and the

Singapore Action were pending, Fujian filed this interpleader action.  *See* Compl., Dkt. 1.  On

January 21, 2016, the Court entered a preliminary injunction enjoining the claimants in this

action from instituting proceedings relating to claims arising from the fuel deliveries to the

---

[11]     In the Louisiana Action, ING sought and was granted a writ of attachment with respect to a different vessel,
the M/V ZHENG YAO, which ING alleged was owned by Fujian under a theory of alter ego liability.  Fujian Mem.
of Law, Dkt. 69 at 3–4; Louisiana Action Compl., Dkt. 9-2; Order of Attachment, Dkt. 9-3.  ING contended that the
attachment of the ZHENG YAO would provide security for unpaid invoices relating to the fueling of several vessels
allegedly owned or controlled by Fujian, including the ZHENG RUN and the ZHENG RONG.  Louisiana Action
Compl., Dkt. 9-2 at 2–3.  The Louisiana Action is captioned *ING Bank N.V. v. Fujian Ocean Shipping Co., Ltd. et
al.* and has case number 16-CV-0007.

ZHENG RUN and the ZHENG RONG.  *See* Prelim. Inj., Dkt. 13 at 2.[12]  On February 1, 2016,

Fujian deposited $1,972,392.60 in the Court's registry to stand as security for the issuance of the

preliminary injunction and as a "substitute *res* for any *in rem* maritime lien claims against the

Vessels, and any *in personam* claims against [Fujian] in this interpleader action . . . ."  Deposit

Order, Dkt. 12; *see also* Cashiers Office Receipt (Feb. 1, 2016 text entry).

On May 11, 2016, ING asserted *in personam* breach of contract counterclaims against

Fujian and *in rem* maritime lien counterclaims against the interpleader fund (the substitute *res* for

the vessels).  ING Ans., Dkt. 24 ¶¶ 5–31.  On February 28, 2017, GET asserted counterclaims

against the interpleader fund for conversion of the bunkers and for unjust enrichment resulting

from Fujian's consumption of the bunkers.  GET Ans., Dkt. 28 ¶ 25.[13]  Following a three-year

hiatus,[14] the parties completed fact discovery.  *See* Order, Dkt. 45 (setting the initial fact

---

[12]     The Court's entry of the preliminary injunction affected the Louisiana Action, the London Arbitration, and the Singapore Action.  With regard to the Louisiana Action, Fujian alleges that it filed its interpleader complaint in this Court as a response to the Louisiana Action because ING's claims relating to the ZHENG RUN and the ZHENG RONG were governed by a forum selection clause designating the Southern District of New York as the required forum.  Fujian Mem. of Law, Dkt. 69 at 4.  Judge Brown in Louisiana accepted Fujian's deposit of $1,972,392.60 in this Court's registry as sufficient security for ING's claims related to the ZHENG RUN and the ZHENG RONG in the case before her.  *See* Order, 16-CV-0007, Dkt. 35 at 2–3 (E.D. La. Feb. 1, 2016).  Judge Brown later transferred ING's claims related to the bunkers provided to those two vessels to the Southern District of New York.  *See* Order & Op., 16-CV-0007, Dkt. 58 (E.D. La. July 27, 2016).

With respect to the London Arbitration, ING did not take any action for several years.  *See* ING Mem. of Law, Dkt. 35 at 10.  In September 2020, ING moved to lift the preliminary injunction so it could "take steps to preserve its contract claims in arbitration against possible time-bar defenses."  ING Mem. of Law, Dkt. 35 at 10–11, 12.  At the urging of the Court, *see* Order, Dkt. 45, the parties agreed that ING would send a letter to the London arbitral panel informing it of the injunction and that the parties were not in a position to move forward with the arbitration, *see* Letter, Dkt. 48.  The Court then dismissed ING's motion to lift the preliminary injunction as moot. *See* Order, Dkt. 52.

Fujian and GET stipulated to a stay of the Singapore Action soon after the entry of the preliminary injunction.  *See* Stay by Consent, Dkt. 70-20 at 1.

[13]     ING also filed crossclaims against the physical suppliers, *see* ING Ans., Dkt. 24 ¶¶ 5–12, and GET filed crossclaims against ING and OWFE, *see* GET Ans., Dkt. 28 ¶¶ 18–27.  Neither ING nor GET pursued those claims further, and they are not discussed in the parties' respective cross-motions for summary judgment.  Accordingly, the Court deems those crossclaims to have been abandoned; they are dismissed with prejudice.

[14]     During the hiatus, parties to the various interpleader actions litigated "test cases" before the Undersigned and the Second Circuit to assess the parties' competing claims to the interpleader funds and the right of the vessel interests to be discharged from liability.  *See generally Clearlake Shipping Pte Ltd. v. NuStar Energy Servs., Inc.*,

discovery deadline).  ING and GET then cross-moved for summary judgment on their respective

claims against Fujian and the interpleader fund, *see* ING Not. of Mot., Dkt. 71; GET Not. of

Mot., Dkt. 66, and Fujian moved to be discharged from liability as a disinterested stakeholder

and for attorneys' fees and costs, *see* Fujian, Not. of Mot., Dkt. 68.

## LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "Where the record

taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

genuine issue for trial."  *Scott v. Harris,* 550 U.S. 372, 380 (2007) (internal quotation marks

omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87

(1986)).  To defeat summary judgment, the nonmoving party must come forward with "specific

facts showing that there is a genuine issue for trial."  *Sista v. CDC IXIS N. Am., Inc.*, 445 F.3d

161, 169 (2d Cir. 2006).  Courts "construe the facts in the light most favorable to the nonmoving

party and resolve all ambiguities and draw all reasonable inferences against the movant."

*Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 167 (2d Cir. 2014) (per curiam) (cleaned up).

## DISCUSSION

## I.    ING Is Entitled to Summary Judgment on Its *In Personam* and *In Rem* Claims

ING's motion for summary judgment on its *in personam* and *in rem* claims is mostly

unopposed,[15] and ING has established that there is no question of fact as to those claims.  As an

---

911 F.3d 646, 649 (2d Cir. 2018) (describing the test cases in more detail); *Clearlake Shipping PTE Ltd. v. O.W. Bunker (Switzerland) SA*, No. 14-CV-10091, 2017 WL 892342, at *2 (S.D.N.Y. Mar. 3, 2017) (same).

[15]    ING is the only party asserting a claim to the interpleader funds associated with the fuel delivery to the ZHENG RUN; the physical supplier, Equatorial, has not appeared.  Fujian acknowledges that ING is the sole claimant to the funds associated with that vessel.  Fujian Mem. of Law, Dkt. 69 at 10.

initial matter, ING has shown that it was validly assigned OWFE's rights under English law.[16]
*See* ING Mem. of Law, Dkt. 73 at 8–11; *see also* Security Agreement, Dkt. 74-18 at cl. 2.3(a)
(noting that each O.W. entity "hereby agrees to assign and hereby assigns absolutely . . . all of its
rights, title and interest in respect of the Supply Receivables"); *id.* at cl. 5.7(b) ("After this
Security has become enforceable . . . [ING] may exercise . . . any of the rights of any Chargor in
connection with any Security Asset.").  Moreover, several courts have found that the 2013
Security Agreement between O.W. and ING included a valid assignment of O.W.'s rights to
ING.  *See, e.g.*, *ING Bank N.V. v. M/V Temara*, 342 F. Supp. 3d 558, 561–63 (S.D.N.Y. 2018)
(finding the assignments valid under English law); *Barcliff, LLC v. M/V DEEP BLUE, IMO No.
9215359*, 876 F.3d 1063, 1074–75 (11th Cir. 2017) (same).

There is no question of fact as to ING's *in personam* contract claims against Fujian.
Fujian and OWFE entered into contracts for the supply of fuel to the ZHENG RUN and the
ZHENG RONG.  *See* Stip. Facts, Dkt. 62 ¶¶ 3–6, 21–25 (describing the two sales order
confirmations at issue).  OWFE performed under the contracts by causing physical suppliers to
deliver bunkers to the vessels.  *Id.* ¶¶ 8, 16, 27, 29, 45.  Fujian's failure to pay for the invoiced
fuel, *see id.* ¶¶ 17, 19, 56, constituted a breach of its obligations under the contracts.  With
respect to ING's contract claim associated with the ZHENG RONG, GET argues that because
OWFE never had title to the bunkers it supplied, it could not have conveyed title to Fujian; GET
argues from that premise that ING, as OWFE's assignor, cannot "bring a claim for the price of
goods under Singapore law."  GET Mem. of Law, Dkt. 67 at 21; *see also* GET Reply, Dkt. 88 at
5. Assuming for the moment that GET did retain title to the bunkers,[17] GET has not established

---

[16]    The Security Agreement is governed by English law.  *See* Security Agreement, Dkt. 74-18 at cl. 20.

[17]    GET, in fact, did not retain title to the bunkers.  *See* Section III(C) of this Opinion, *infra*.

why that means ING's contract claims against Fujian must fail.  OWFE's contract claim (and

thus ING's claim) against Fujian is governed by English law,[18] rendering GET's conclusory

statements regarding Singapore law irrelevant.  Moreover, GET cites no authority to explain why

the Retention of Title clause in its own contract with OWFE would eliminate OWFE's separate

contract claim against Fujian.  Although GET may have a good argument that OWFE breached

its contract with GET — a claim not at issue in the pending motions — with nothing other than

GET's *ipse dixit* opposing the motion, the Court finds that ING is entitled to summary judgment

on its contractual claims against Fujian.

There is also no question of fact as to ING's *in rem* maritime lien claims against the

substitute *res*.  Pursuant to the Commercial Instruments and Maritime Lien Act ("CIMLA"), an

entity holds a maritime lien if it provides "necessaries" to a vessel "on the order of the owner or

a person authorized by the owner."  *ING Bank N.V. v. M/V TEMARA, IMO No. 9333929*, 892

F.3d 511, 518–19 (2d Cir. 2018) (citing 46 U.S.C. § 31342(a)).  Bunkers are undoubtedly

necessaries.  *See id.* (citing *Hapag-Lloyd Aktiengesellschaft v. U.S. Oil Trading LLC*, 814 F.3d

146, 151 n.13 (2d Cir. 2016)).  Although OWFE did not itself deliver fuel to the vessels, under

existing caselaw, a contract supplier provides necessaries within the meaning of CIMLA when it

contractually arranges for a third party to deliver the physical bunkers to a vessel.  *See* ING

Mem. of Law, Dkt. 73 at 12–13 (collecting cases, including in other analogous O.W. matters).

The undisputed, jointly stipulated facts in this case show that OWFE acted on the order of

Fujian, the vessel interest in this case.  *See* Stip. Facts, Dkt. 62 ¶¶ 3–4, 21–22.  Given that

evidence, it is unsurprising that neither Fujian nor GET contest that ING holds maritime liens

---

[18]     The sales confirmation order associated with the refueling of the ZHENG RONG incorporates O.W.'s
terms and conditions for sales of marine bunkers.  *See* Sales Order Conf., Dkt. 74-7 at 2.  O.W.'s terms and
conditions include a choice of law provision that applies English law to any contractual claims.  *See* Terms &
Conditions, Dkt. 74-19 ¶ P.1.

with respect to both the ZHENG RUN and the ZHENG RONG.[19]  In short, ING is entitled to summary judgment on its maritime lien claims against the substitute *res*.

For the foregoing reasons, ING's motion for summary judgment on its *in personam* contract claims and its *in rem* maritime lien claims is granted.[20]

## II.   GET's Unjust Enrichment Claim Was Abandoned and Is Dismissed

GET asserted a counterclaim against Fujian "for unjust enrichment resulting from its consumption of Bunkers belonging to [GET] for which it has failed to pay."  GET Ans., Dkt. 28 ¶ 25.  "Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way."  *Ragland v. City of New York*, No. 20-CV-3556, 2022 WL 580923, at *7 (S.D.N.Y. Feb. 25, 2022) (internal citation omitted).  Moreover, "[f]ederal courts have found that a [party] abandons their claim when they fail to address it in their opposition papers to summary judgment."  *Id.* (internal citation omitted).

GET has clearly abandoned its unjust enrichment claim against Fujian: it did not reference the claim in its motion for summary judgment, and it did not oppose ING's arguments that the claim fails as a matter of law.[21]  *See* GET Not. of Mot., Dkt. 66 at 1 (moving for

---

[19]      To the extent that GET's argument about retention of title applies to ING's maritime lien claim, that argument is unavailing for the same reasons discussed *supra*.

[20]      ING is not arguing that it can recover twice, first on its *in rem* claims and again on its *in personam* claims.  Because there is only one underlying debt, the *in rem* and *in personam* claims are alternative devices to obtain the same relief.

[21]      The only reference to unjust enrichment in GET's opening brief is a passing remark that a decision in favor of ING would constitute unjust enrichment.  *See* GET Mem. of Law, Dkt. 67 at 22 ("ING should not be permitted to take the proceeds for the sale of bunkers that its purported assignor never owned, without also paying the value of those bunkers to [GET], who at all times remained their rightful title holder.  Any other outcome would constitute conversion and/or unjust enrichment.").  GET has not pursued its crossclaims against ING, *see* note 13 *supra*, and its motion for summary judgment relates only to its claims against Fujian, *see* GET Not. of Mot., Dkt. 66.  But even if GET had pursued its unjust enrichment claim against ING, GET has not responded to ING's compelling argument that any such claims must be pursued as part of the O.W. insolvency proceedings and not before this Court.  *See* ING Resp., Dkt. 83 at 20–21.

summary judgment only on the conversion claim); GET Mem. of Law, Dkt. 67 (arguing only

that GET's claim for conversion should be granted); ING Mem. of Law, Dkt. 73 at 17–19

(arguing that GET's unjust enrichment claim fails); GET Resp., Dkt. 81 (failing to mention

unjust enrichment).[22]

Accordingly, because GET has abandoned its unjust enrichment claim, that claim is

dismissed with prejudice.

### III.    GET Is Not Entitled to Summary Judgment on Its Conversion Claim

#### A. Application of Singapore Law to GET's Conversion Claim

GET contends that Singapore law[23] applies to its conversion claim.  *See* GET Mem. of

Law, Dkt. 67 at 9–10.  ING is "not certain" that Singapore law applies, but argues that, even if

Singapore law does apply, the claim fails.  *See* ING Resp., Dkt. 83 at 7 n.3; *see also* ING Mem.

of Law, Dkt. 73 at 16 n.4.  The Court presumes without deciding that Singapore law applies to

GET's conversion claim.  Because GET's only remaining claim is that Fujian unlawfully

converted the bunkers under Singapore law, and because that claim is not viable under the law of

Singapore, the Court need not definitely determine whether GET's choice of law analysis is

correct.[24]

---

[22]     GET's abandonment of its unjust enrichment claim against Fujian is logical — it is hard to argue that
Fujian has been unjustly enriched when Fujian has admitted liability, is ready to pay for the bunkers, and has
deposited funds with the Court for just that purpose.

[23]     Both parties refer to the law of Singapore as "Singapore law."  *See e.g.*, GET Mem. of Law, Dkt. 67 at 9–
10; ING Resp., Dkt. 83 at 6.  The Court follows the cues of the parties but is left wondering why — like American
law or English law — the correct term is not Singaporean law.

[24]     Both GET and ING have submitted declarations by experts in Singapore law.  GET submitted two
declarations from its expert, Lok Vi Ming, *see* First Lok Decl., Dkt. 82; Second Lok Decl., Dkt. 89, and ING
submitted three declarations from its expert, Liew Wey-Ren Colin, *see* First Liew Decl., Dkt. 76; Second Liew
Decl., Dkt. 92; Supp. Liew Decl., Dkt. 84.

Both parties agree that to succeed on a conversion claim under Singapore law, GET must demonstrate that "(a) it had actual possession of, or the right to immediate possession, of the bunkers converted; (b) the right to sue for conversion existed at the time of the conversion; and (c) [Fujian] acted in a matter inconsistent with GET's superior possessory title."  First Lok Decl., Dkt. 82 ¶ 9; *see also* First Liew Decl., Dkt. 76 ¶ 31 (listing the same elements).  The Singapore High Court has already considered a conversion claim brought by GET in a different matter involving an O.W. affiliate.  *See Precious Shipping Pub. Co. Ltd. v. OW Bunker Far E. (Singapore) Pte Ltd.* [2015] 4 SLR 1229 ("*Precious Shipping*").[25]  The High Court discussed GET's conversion claim in the following three paragraphs:

> The "tort of conversion argument" is similarly premised on the physical suppliers having title to the bunkers.  The argument is that the purchasers, in consuming the bunkers, have interfered with the physical suppliers' possessory rights and are therefore liable in the tort of conversion.  I do not agree.
>
> A claim in conversion lies where there has been an unauthorised dealing with a chattel in a manner which deprives the claimant of the use and the possession of the same.  It necessarily follows, therefore, that acts which are performed within the scope of the actual owner's permission cannot attract liability in the tort of conversion.  In the present case, the physical suppliers *delivered* the bunkers to the vessels and must plainly have intended (or at least must be taken to have intended) for the bunkers to be consumed.  This is consistent with cl H.2 of the OW entities' [General Terms & Conditions] which permitted the bunkers to be used in the propulsion of the vessel even before payment.  This being the case, it is clear that no claim in conversion may lie.
>
> In any event, any claim in conversion, even if it does exist, will lie only in *damages*.  It does not follow that the physical suppliers have a legitimate claim to the *contractual price* of the bunkers under the Purchaser–Seller contract.

*Precious Shipping*, Dkt. 76-2 at 1250–51 (internal citations omitted) (emphasis in original).

ING argues that the holding in *Precious Shipping* forecloses GET's conversion claim. ING Mem. of Law, Dkt. 73 at 20–21; ING. Resp., Dkt. 83 at 8–11; First Liew Decl., Dkt. 76 ¶

---

[25]     The full decision in *Precious Shipping* is found at docket entry 76-2.

44.  The Court disagrees.  Although the holding in *Precious Shipping* certainly informs the Court's analysis,[26] the facts in this case are sufficiently different from those in *Precious Shipping* such that the holding in *Precious Shipping* does not completely foreclose GET's conversion claim.

GET contends that Fujian converted the bunkers when it consumed them after November 10, 2014, the date that GET's attorneys put Fujian on notice that "[OWFE] had not paid for [the bunkers], did not own them, and could not pass title and, moreover, that [GET] did own them, had not been paid for them, and was seeking to reclaim them, as it was entitled to do under its contract with [OWFE]."  GET Mem. of Law, Dkt. 67 at 17–18.  Put another way, "the *Precious Shipping* court nowhere actually considered or addressed the relevance of the key factors in this case, *i.e.*, that [GET] here sent a notice of retention of title to Fujian before Fujian had consumed the bunkers and therefore timely revoked any license to consume them that might otherwise have been inferred from the agreements or the circumstances of the bunker delivery."  GET Reply, Dkt. 88 at 2.[27]  In short, the holding in *Precious Shipping* turns on the inference that the physical

---

[26]     GET argues that *Precious Shipping* should not be considered at all because it only decided the procedural question of whether an interpleader action could be maintained under Singapore law and was not a ruling on the merits.  GET Reply, Dkt. 88 at 1–2.  Although GET is correct regarding the procedural posture of the case, an interpleader action may only be maintained under Singapore law if the competing claimants can demonstrate that they have *prima facie* cases.  *See Precious Shipping*, Dkt. 76-2 at 1247–48; First Liew Decl., Dkt. 76 ¶ 18.  So even though the High Court did not reach the merits of GET's claim, the High Court's assessment of what constitutes a *prima facie* case of conversion is germane when considering Singapore law on conversion more generally.

[27]     ING notes that some of the suppliers at issue in *Precious Shipping* also wrote to the vessel interests to inform them of the retention of title clauses in their contracts with the O.W. affiliated entities.  ING Mem. of Law, Dkt. 73 at 20; ING Resp., Dkt. 83 at 10.  But the Court has no information about whether any of those notices had been sent before the bunkers had been consumed by the vessels.  Moreover, the court in *Precious Shipping* did not appear to consider those notices when discussing the conversion claim.  The court's brief mention that "some of the physical suppliers have written to the purchasers seeking to recover the price of the bunkers," *see Precious Shipping*, Dkt. 76-2 at 1236, comes 14 pages before the court's discussion of the conversion claim, *see id.* at 1250–51; it seems unlikely that any notice by the physical suppliers was considered in the context of that claim.  Additionally, even ING's Singapore law expert acknowledged that *Precious Shipping* does not address the unique facts at issue in this case, namely "where, after the purchaser is supplied with the bunkers pursuant to its contract with the OWB entity and is in the midst of consuming them, the physical supplier purports to assert its title and withhold consent to such consumption."  First Liew Decl., Dkt. 76 ¶ 54.

supplier consented to the bunkers being consumed after they were delivered and before they

were paid for; here, GET expressly revoked any implied consent before the fuel had been

consumed.[28]  Accordingly, the holding in *Precious Shipping* — on its own and without more —

does not foreclose GET's conversion claim.

### B.  The Doctrine of Equitable Estoppel Precludes GET's Conversion Claim

Under *Precious Shipping*, had the ZHENG RONG fully consumed the bunkers prior to

GET's November 10, 2014 notice, Fujian would not be liable for conversion because GET "must

plainly have intended (or at least must be taken to have intended) for the bunkers to be

consumed."  *Precious Shipping*, Dkt. 76-2 at 1250–51.  At issue in this case is whether GET's

November 10, 2014, notice revoked that implied consent such that any future consumption

constituted conversion.  ING argues that GET was equitably estopped from revoking its implied

consent to consumption and that equitable estoppel is a complete defense to a conversion claim

under Singapore law.  ING Mem. of Law, Dkt. 73 at 21–22.  GET does not contest that equitable

estoppel is a complete defense to a conversion claim; instead, GET argues that ING has not

shown that the elements of equitable estoppel have been met.  The Court disagrees.

Under Singapore law, the doctrine of equitable estoppel has three elements: (1) "a

representation or conduct amounting to a representation intended to induce a course of conduct

on the part of the person to whom the representation is made;" (2) "an act or omission resulting

from the representation, whether actual or by conduct, by the person to whom the representation

---

[28]     ING disputes that none of the fuel had been consumed prior to the November 10, 2014 notice.  *See* ING
Mem. of Law, Dkt. 73 at 21.  Both parties agree that because the fuel delivered by GET was commingled with the
fuel already on board, *see* Stip. Facts, Dkt. 62 ¶ 46, it is impossible to determine whether the fuel actually consumed
between November 4 and November 10, 2014, was fuel that GET delivered.  But even assuming that the consumed
fuel could somehow be traced back to GET, that does not change the ultimate question of whether Fujian converted
the vast majority of the fuel GET delivered when the vessel consumed it after receiving GET's notice.

is made;" and (3) "detriment to such person as a consequence of the act or omission."[29]  First

Liew Decl., Dkt. 76 ¶ 58 (citing *Tong Seak Kan v. Jaya Sudhir a/l Jayaram* [2016] 5 SLR 887,

[37]).

There is no doubt that the first element has been met.  GET delivered the bunkers to

Fujian so that they could be consumed, even before they were paid for.[30]  That is the relevant

holding in *Precious Shipping*: GET "*delivered* the bunkers to the vessel[] and must plainly have

intended (or at least must be taken to have intended) for the bunkers to be consumed."  *Precious*

*Shipping*, Dkt. 76-2 at 1250–51 (emphasis in original).  GET argues that permission to consume

the bunkers "is a very different thing from stating that [GET] 'induced' Fujian to consume

them."  GET Resp., Dkt. 81 at 13.  That argument is sophistry, and GET points to no authority to

support such a differentiation.  GET's next argument, that the permission to consume the bunkers

prior to payment arises in contract and because GET's contract was with OWFE, it never made a

representation to Fujian, *see* GET Reply, Dkt. 88 at 4–5; First Lok Decl., Dkt. 82 ¶¶ 88–89, is

similarly unavailing.  The existence of contracts between various parties does not change the fact

that the delivery of the bunkers itself, regardless of contractual obligations, constitutes "conduct

amounting to a representation" under an equitable estoppel theory.[31]  Moreover, ING's expert on

---

[29]    Both parties contend that the third element requires courts to consider whether allowing the representation that induced the course of conduct to be withdrawn would have caused any detriment to Fujian.  *See e.g.*, GET Resp., Dkt. 81 at 13–14 (arguing that Fujian had options like replacing the bunkers that would have ensured no detriment occurred); ING Mem. of Law, Dkt. 73 at 21–22 (responding that pursuing such options would still be detrimental for Fujian).  The Court assumes that the parties' interpretation of the requirements of Singapore law relative to this element is correct.

[30]    In the stipulated facts, GET acknowledges that it was "aware that the M/V ZHENG RONG might consume the fueloil and gasoil prior to the due dates for payment of . . . [GET']s invoice . . . ."  Stip. Facts, Dkt. 62 ¶ 59.  In that same paragraph, GET states that although it recognized that the bunkers may be consumed prior to payment, it "did not consider this a waiver of any party's terms and conditions."  *Id.*  But GET's understanding of its own representations is irrelevant to the question of whether those representations induced a course of conduct by Fujian.

[31]    Moreover, similar contracting relationships existed among GET, the O.W.-affiliated entity, and the vessel interest in *Precious Shipping*.  The High Court of Singapore did not consider those contractual relationships when concluding that the physical suppliers "plainly have intended (or at least must be taken to have intended) for the bunkers to be consumed."  *Precious Shipping*, Dkt. 76-2 at 1250–51.

Singapore law, citing relevant caselaw, explains that the required representation may be made by a third party and privity of contract is not required.  *See* Second Liew Decl., Dkt. 92 ¶¶ 93–94 (citing *JTrust Asia Pte Ltd. v. Grp. Lease Holdings Pte Ltd.*, [2020] 2 SLR 1256, [191]).  GET does not address that argument.  The Court concludes that GET's delivery constituted an implied representation that induced Fujian to consume the bunkers, satisfying the first element of equitable estoppel.

The second element of equitable estoppel — that Fujian made "an act or omission resulting from the representation, whether actual or by conduct" — has also been met.  Here, Fujian acted and failed to take other actions in obvious reliance on the implied representation that it could consume the fuel prior to payment.  Fujian commingled the fuel with existing fuel that was already on board the vessel, effectively preventing it from returning GET's fuel if that were demanded.  If Fujian were not relying on GET's implied representation that the fuel could be immediately consumed, commingling the fuel with fuel from other physical suppliers would make little sense.  Moreover, GET acknowledges that in the period between November 4-5, 2014 (when the physical suppliers delivered the fuel to the vessel) and November 10, 2014 (the day the vessel arrived in Indonesia and the day GET revoked its implied consent to consume the bunkers), the vessel used an amount of fuel almost equal to the amount of fuel that had been on board the vessel prior to the refueling.  *See* GET Resp., Dkt. 81 at 16.  If Fujian was not relying on GET's implied representation that it could consume the delivered fuel prior to payment, it surely would have made arrangements for additional refueling, just in case it was necessary, or would have undertaken some other preparations to account for the scenario that it might have to return the fuel that had just been delivered.  But Fujian did not do so.  Given Fujian's affirmative acts and its failure to take other actions in reliance on GET's implied representation that it could consume the fuel prior to payment, the second element of equitable estoppel has been met.

17

The third element, that Fujian would have suffered a detriment if GET had been permitted to revoke its implied representation, has also been satisfied.  GET argues that Fujian would not have suffered a detriment because "it could just as easily have off-loaded the bunkers and replaced them with fuel from another source or arranged for payment directly to [GET]."  GET Resp., Dkt. 81 at 13–14.  But both options would have had obvious detrimental consequences for Fujian.  Any off-loading of the bunkers[32] and replacement with fuel from another source could only have come with inevitable delays and costs for Fujian.  *See* Second Liew Decl., Dkt. 92 ¶ 106.  Paying GET directly would have had the obvious detriment of exposing Fujian to double liability, as it would still have been on the hook to pay OWFE.  ING Mem. of Law, Dkt. 73 at 21–22; ING Resp., Dkt. 83 at 16.

GET did not respond to ING's arguments that the vessel would have incurred costs and delays if it had honored GET's revocation of its implied consent to Fujian consuming the fuel.  GET did argue that ING's argument regarding the risk of double liability is circular.  *See* First Lok Decl., Dkt. 82 ¶ 92 ("[T]his this is a circular argument.  The whole point of asking whether GET is estopped from withdrawing its consent to the vessel consuming bunkers before payment is to establish whether GET has a claim in conversion or not.  It begs the question to say that GET is not allowed to withdraw its consent because if it does, then [Fujian] will be disadvantaged by having to face a claim in conversion.").  But GET misses ING's point: had Fujian obviated the conversion claim by paying GET, it would have suffered a detriment because it would have remained liable to OWFE, the party with whom it contracted.  Put another way, because Fujian's potential liability to OWFE is not mutually exclusive with GET's conversion

---

[32]   Because the bunkers had been commingled, it would have been physically impossible to off-load the bunkers GET had supplied.  Assuming, however, that GET would not have insisted on return of the actual molecules of fuel it delivered, it would have been physically possible for the vessel to have off-loaded an equivalent volume of fuel.  But there can be no question that the process of off-loading and re-loading the vessel would have delayed the vessel.

claim, paying GET would not have permitted Fujian to escape the detriment. Given the inevitable costs and delays associated with offloading the bunkers and securing fuel from another source as well as Fujian's exposure to double liability had it paid GET directly, Fujian would have suffered a detriment if GET's revocation of its implied consent were effective. In short, the third element of the equitable estoppel has been satisfied.

Because ING has shown that GET was equitably estopped from revoking its implied consent that Fujian could consume the bunkers prior to payment and because equitable estoppel is a complete defense to conversion under Singapore law, GET's motion for summary judgment on its conversion claim is denied.

### C. GET's Conversion Claim Also Fails Because It Did Not Retain Title to the Bunkers

Although equitable estoppel is a complete defense to conversion, the Court separately finds that GET's conversion claim also fails because it did not retain title to the bunkers it delivered to Fujian. GET argues that pursuant to the Retention of Title clause in its contract with OWFE, title to the bunkers would not pass from GET until GET received payment. *See* GET Terms & Conditions, Dkt. 93-6 ¶¶ 12.2., 12.2.1 ("[P]roperty in the Products shall not pass from the Seller to the Buyer until . . . the Seller receives . . . payment for the Products."). GET acknowledges that its conversion claim is based on the Retention of Title clause. *See* GET Mem. of Law, Dkt. 67 at 13 ("As the owner of the bunkers [pursuant to the Retention of Title clause] who was entitled to — and did — demand the immediate delivery up of the same before they were consumed, [GET] had the immediate right to possess the bunkers; therefore, it has title to sue for conversion for the non-delivery up and/or the use or disposal of its bunkers."); First Lok Decl., Dkt. 82 ¶ 29 ("GET's title in the bunkers entitles GET to immediate possession of the bunkers that enables successful prosecution of a claim for conversion against [Fujian]").

Accordingly, if GET was not the owner of the bunkers at the time of the purported conversion, then GET has no conversion claim.[33]

As both parties acknowledge, Section 17 of Singapore's Sale of Goods Act governs the interpretation of the Retention of Title clause. *See* First Liew Decl., Dkt. 76 ¶ 87 (discussing Section 17 of Singapore's Sale of Goods Act); GET Resp., Dkt. 81 at 14–15 (same). Section 17 provides: "(1) Where there is a contract for the sale of specific or ascertained goods, the property in them is transferred to the buyer at such time as the parties to the contract intend it to be transferred. (2) For the purpose of ascertaining the intention of the parties, regard shall be had to the terms of the contract, the conduct of the parties and the circumstances of the case." Sale of Goods Act 1979, c. 393, § 17 (Sing.).[34] Singapore law gives "the written agreement . . . first and primary importance" but considers extrinsic evidence "so long as it is 'relevant,' 'reasonably available to all the contracting parties' and relates to a 'clear or obvious context.'" First Lok Decl., Dkt. 82 ¶ 27 (quoting *Materials Indus. & Trade (Singapore) Pte Ltd. v. Vopak Terminals Singapore Pte Ltd.*, [2020] 4 SLR 619 (SGHC), [64]).

GET contends that the Retention of Title clause reflects the parties' intention that title to the bunkers would only be transferred when GET received payment from OWFE. GET Resp., Dkt. 81 at 14–15. ING argues that the clause is ambiguous because "the circumstances of this case demonstrate that GET intended that OWFE would have authority to on-sell the bunkers for OWFE's own account and that, if it did so, GET would lose title to the bunkers and would

---

[33]    The converse of this statement — that if GET owned the bunkers at the time of the purported conversion, then its conversion claim succeeds — is not necessarily true. Under Singapore law, a claim for conversion focuses on whether GET had "the right to immediate possession" of the bunkers, not whether it held title to the bunkers. *See* First Lok Decl., Dkt. 82 ¶ 9; First Liew Decl., Dkt. 76 ¶ 31.

[34]    GET provided a link to Singapore's full Sale of Goods Act in its memorandum of law. *See* Mem. of Law, Dkt. 67 at 11 n.1.

instead look to assert security against any sales proceeds obtained by OWFE."  ING Resp., Dkt. 83 at 11; *see also* First Liew Decl., Dkt. 76 ¶¶ 98, 104.

Although the Court agrees with GET that — on its face — the plain words of the Retention of Title clause appear to provide that title in the bunkers remained with GET until OWFE paid for them, *see* GET Resp., Dkt. 81 at 14–15, the Court is persuaded that, in the context of this transaction, the clause is ambiguous, and that ING's statement of the parties' intent is correct.  In a seminal decision considering retention of title clauses, the Singapore High Court noted that "[d]espite the ubiquity and apparent simplicity of retention of title clauses, a considerable body of English case law has developed to address various difficult questions concerning the scope, consequences and enforceability of such clauses."[35]  *Mitsubishi Corp. RTM Int'l Pte Ltd. v. Kyen Res. Pte Ltd.*, [2019] SGHCR 6, [36].[36]  The retention of title clause at issue in *Mitsubishi* had an apparent plain meaning, but the Singapore High Court spent over a dozen pages discussing its unique applications.  Among the issues discussed was whether the parties intended for title to be retained in the event of an on-sale or whether, in the event of an on-sale, title would pass from seller to buyer leaving the original seller with security for the buyer's payment in the form of the sale proceeds, which would be held by the buyer for the benefit of the original seller.  *Id.* at [83].[37]  Accordingly, Singapore caselaw suggests that the

---

[35]      *See* First Liew Decl., Dkt. 76 ¶ 7 ("Singapore is a common law jurisdiction whose system of law is heavily based on English law.").

[36]      Neither party provided a copy of the *Mitsubishi* decision.  The Court takes judicial notice of the full decision, available online at https://www.elitigation.sg/gdviewer/s/2019_SGHCR_6 (last visited Mar. 20, 2022).

[37]      Although the answer to that question is relevant to the facts in this case, the Court declines to consider the holding in *Mitsubishi* because the substance of the retention of title clause in that case was quite different from the one at issue here.  *See Mitsubishi Corp. RTM Int'l Pte v. Kyen Res. Pte Ltd.*, [2019] SGHCR 6,  [7], [83]; First Lok Decl., Dkt. 82 ¶¶ 50–51.

conduct of the parties and the circumstances of the case are relevant when interpreting retention

of title clauses, even when such clauses have apparent plain meanings on their face.

In the *Precious Shipping* case, GET itself argued that an identical retention of title clause

incorporated in a different refueling contract gave it the right to the proceeds of the sale of

bunkers to another O.W. affiliate.  Chio Kian Tiong, the director of GET, stated the following in

a sworn affidavit:

> It is [GET's] position that [GET is] entitled to the Sum for the reason that
> pursuant to [GET's] Retention of Title Clause, [GET] at all times retained and
> retains title to and property in the Bunkers and the Plaintiffs' payment for the
> same must and ought to be made to them and not to any other party.  [The O.W.
> affiliate] never paid [GET] for the Bunkers and in turn could not have received
> title to and property in the same.  The Bunkers therefore never came under the
> "assets" of [the O.W. affiliate].  In the premises, [the O.W. affiliate] were never
> and are not able to pass good title and property in the Bunkers to any other party.
> [GET is] advised and verily believe[s] that this means [the O.W. affiliate] or ING
> as their assignees . . . have no basis to claim for the said Sum.

Chio Decl., Dkt. 84-1 ¶¶17–19 (cleaned up).[38]  Although GET maintained its position that it

retained title in the bunkers, it conceded that, in the context of that case, retention of title meant

retention of title in the sales proceeds, exactly ING's contention in this case.  Here, GET's only

response to ING's argument arising from GET's position in *Precious Shipping* is that *Precious*

*Shipping* involved "a completely different set of legal proceedings relating to a different vessel."

First Lok Decl., Dkt. 82 ¶ 52.  But the fact that even GET — admittedly in a different context[39]

---

[38]     ING's Singapore law expert also quotes from a second affidavit from Chio Kian Tiong, which apparently reiterated GET's position in the *Precious Shipping* litigation.  *See* Second Liew Decl., Dkt. 92 ¶ 46.  But because a full copy of that affidavit is not in the record, the Court declines to consider it.

[39]     In *Precious Shipping*, it appears the bunkers had already been consumed by the vessel by the time GET invoked the Retention of Title clause; the proceeds of the sale were all that remained.  *See* Chio Decl., Dkt. 84-1 ¶ 7 (stating that the refueling occurred on October 7-8, 2014); *id.* ¶ 9 (noting that on November 10, 2014, GET's lawyers issued a formal notice invoking the retention of title clause).

— found room to construe the very same Retention of Title clause beyond its plain meaning suggests that the clause is ambiguous.

Because the terms of the Retention of Title clause are ambiguous, the Court considers "the conduct of the parties and the circumstances of the case."  Sale of Goods Act 1979, c. 393, § 17(2) (Sing.).  Here, the parties' conduct and the circumstances of the case clearly support the conclusion that GET intended to retain title to the proceeds of the sale, not to the bunkers themselves.  Most fundamentally, GET delivered the bunkers to the vessel with the understanding that the vessel could consume the bunkers before payment.  *See* Stip. Facts, Dkt. 62 ¶ 59 ("The parties to this fueloil/gasoil supply were aware that the M/V ZHENG RONG might consume the fueloil and gasoil prior to the due dates for payment . . . ."); GET Terms & Conditions, Dkt. 93-6 ¶ 6.1 (stating that the Buyer, here OWFE, is responsible for accepting the bunkers "for use by the Vessel"); *see also Precious Shipping*, Dkt. 76-2 at 1250–51 ("[T]he physical suppliers *delivered* the bunkers to the vessels and must plainly have intended (or at least must be taken to have intended) for the bunkers to be consumed." (emphasis in original)).  As ING's expert explained, GET took "the risk that, by the time payment under the GET Terms was due, all of the Bunkers might have been consumed and there would be nothing for it to retain title over.  [S]uch an outcome seems inconsistent with GET intending to retain title to the Bunkers."  First Liew Decl., Dkt. 76 ¶ 93.  Those circumstances strongly suggest that what GET intended was that, until it was paid, pursuant to its Retention of Title clause, GET could assert security rights in the proceeds of the bunker sales by OWFE and not that it retained title to the — likely consumed — bunkers themselves.

Consistent with that being GET's intent, its Retention of Title clause did not require "its" bunkers to be stored separately nor did it forbid commingling "its" bunkers with any bunkers already on board the vessel or with the bunkers provided by other physical suppliers.  *See*

23

*generally* GET Terms & Conditions, Dkt. 93-6.  Such provisions are not unheard of.  *See, e.g.*,

First Liew Decl., Dkt. 76 ¶ 111 (noting that a retention of title clause at issue in a Hong Kong

case "required the bunkers to be clearly identified and segregated" (citing *Newocean Petroleum*

*Co. Ltd. v. O W Bunker China Ltd. (in provisional liquidation)*, [2016] 1 Lloyd's Rep 581 [34]));

*Mitsubishi Corp. RTM Int'l Pte*, SGHCR 6 at [7] (quoting the retention of title clause in the

relevant contract in full, including a provision that the buyer must "store the Goods in such a

manner that they are clearly identifiable as the property of the Seller").  It is hard to retain title

over something that, upon delivery, loses its identity; instead, it is apparent that GET was less

interested in retaining title to the bunkers themselves than in having security rights in the

proceeds from the sale of those bunkers.[40]  Accordingly, the Court finds that the parties intended

that, until payment, GET retained title to the proceeds of the sale of the bunkers; it did not retain

title to the bunkers themselves.

In short, because GET's conversion claim is premised on its contention that it held title to

the bunkers and because GET did not in fact retain title to the bunkers, GET's motion for

summary judgment on its conversion claim is denied.

## IV.   Fujian's Motion that It and the Vessels Be Discharged from Liability Is Granted

Fujian moved for it and the two vessels to "be released and discharged from any and all

liability to the Defendant-claimants arising out of or relating to the subject bunker transactions."

---

[40]     GET argues that, because fuel is fungible, "ownership shall be retained in proportion to the quantities contributed by the individual parties."  GET Resp., Dkt. 81 at 15–16; *see also* First Lok Decl., Dkt. 82 ¶ 33–34.  The Court agrees with ING's expert that it seems "unlikely that it was the parties' intention for the [Retention of Title] Clause to work in that way: it would have made little commercial sense for GET to 'retain' title to an undefined, fractional share of a mixture of fuels, to be held in common with anyone else who might have contributed to that mixture."  Second Liew Decl., Dkt. 92 ¶ 39.  GET's contention also implies that there would be no adequate remedy were the vessel to have consumed all of the fuel or a large portion of the fuel, as that would leave GET completely or almost completely empty handed.  What is much more logical is that the parties intended the Retention of Title clause to give GET title to the proceeds of the sales of the bunkers and not title to the bunkers themselves.

Not. of Mot., Dkt. 68 at 2.  To be entitled to discharge in a Rule 22 interpleader,[41] (1) the Court must have subject-matter jurisdiction over the action, and (2) the plaintiff must show that they "may [be] expose[d] . . . to double or multiple liability," *see* Fed. R. Civ. P. 22(a)(1).  *See Metro. Life Ins. Co. v. Little*, No. 13-CV-1059, 2013 WL 4495684, at *1–2 (E.D.N.Y. Aug. 17, 2013) (discerning those two requirements from caselaw)  The two requirements are met here.

With respect to subject-matter jurisdiction, Rule 22 interpleader actions "must be based upon the general jurisdiction statutes applicable to civil actions in the federal courts."  7 Wright & Miller, *Federal Practice & Procedure* § 1710 (3d ed. 2021).  There is no question that the Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1333, which confers jurisdiction to federal courts in any civil case of admiralty or maritime jurisdiction.[42]  Moreover, the Court has already rejected ING's prior objections to the Court's jurisdiction based on the first-to-file rule.  *See* Letter, Dkt. 9 (arguing that the Court should dismiss this case given the pending Louisiana Action under the "first-to-file" rule); Order, Dkt. 10 (finding that the Court's jurisdiction over this interpleader action was proper).  Accordingly, the first requirement for discharge has been met.

---

[41]     This interpleader action is governed by Rule 22 of the Federal Rules of Civil Procedure and not 28 U.S.C. § 1335, the statutory basis for interpleaders.  *See* Fujian Mem. of Law, Dkt. 69 at 9 n.4 (explaining that because statutory interpleader requires diversity of parties and because all defendant-claimants are foreign entities, Fujian commenced its interpleader action under Rule 22).  Moreover, "[w]hether brought under the Court's general federal question jurisdiction and Rule 22, as in this case, or under the federal interpleader statute, 28 U.S.C. § 1335, an interpleader complaint generally involves a two-stage inquiry.  The first stage requires the stakeholder to demonstrate that the requirements for interpleader have been met and that it is entitled to a discharge.  The second stage determines the adverse claims between the claimants.  This bifurcation is not mandatory, however, and the entire action may be disposed of at one time."  *Metro. Life Ins. Co. v. Little*, No. 13-CV-1059, 2013 WL 4495684, at *1 (E.D.N.Y. Aug. 17, 2013) (cleaned up).  Here, the Court has consolidated the two stages into one inquiry.

[42]     *See also UPT Pool Ltd. v. Dynamic Oil Trading (Singapore) PTE. Ltd.*, No. 14-CV-9262, 2015 WL 4005527, at *5 (S.D.N.Y. July 1, 2015), *aff'd sub nom. Hapag-Lloyd Aktiengesellschaft v. U.S. Oil Trading LLC*, 814 F.3d 146 (2d Cir. 2016) ("Because the claims raised in the Interpleader Actions relate to the provision of necessaries to Vessels resulting in the purported creation of maritime lien claims and potential *in personam* claims based on maritime contracts, no party disputes that the Interpleader Actions are properly brought pursuant to the Court's admiralty and maritime jurisdiction.").

Fujian has also shown that it and the vessels may be exposed to "double or multiple liability." Fed. R. Civ. P. 22(a)(1). As discussed *supra*, ING and GET each argue that it is entitled to payment for the same debt. Moreover, Fujian has been subject to multiple legal actions to recover that same debt, including the London Arbitration, the Louisiana Action, and the Singapore Action. *See also* Order, Dkt. 10 at 3 ("[The existence of two proceedings commenced by ING relating to the same claims lends credence to Plaintiff's argument that it risks substantial harm if it cannot commence a single interpleader in which its liability can be fully resolved as against all potential claimants."). ING argues that Fujian is not exposed to multiple liability with respect to the refueling of the ZHENG RUN. *See* ING Resp., Dkt. 85 at 1 ("[I]t is unclear on what legal basis Fujian should obtain interpleader relief in the absence of a competing claimant."); *see also id.* at 6 (making the same argument). But Rule 22 only requires that a plaintiff "may" be exposed to double or multiple liability, *see* Fed. R. Civ. P. 22(a)(1); it does not require any competing claimant actually to file a claim. There is no question that when Fujian filed its interpleader action, at a time when dozens of legal actions related to the O.W. collapse were pending around the world and ships were being attached or threatened with attachment, Fujian and the two vessels were potentially exposed to liability to all Defendants in this action, including the ones that ultimately did not appear. Accordingly, Fujian has met the second requirement for discharge under Rule 22.[43]

In sum, Fujian and the vessels' motion that they be discharged from liability as to ING and GET's claims arising out of the refueling of the ZHENG RONG and the ZHENG RUN is

---

[43]    Both ING and GET argue that Fujian should not be discharged until the Court has resolved their competing claims to the same debt. *See* ING Resp., Dkt. 85 at 3–4; GET Resp., Dkt. 79 at 2. Because this Opinion resolves those competing claims, that argument is now moot.

granted.  As against ING and GET, the January 21, 2016 preliminary injunction (Dkt. 13) is made permanent.[44]

## V.      Allocation of the Interpleader Fund on Deposit Between Fujian and ING

### A.  The Amount on Deposit

On February 1, 2016, Fujian deposited $1,972,392.60 into the Court's registry.  Deposit Order, Dkt. 12 at 1; Cashiers Office Receipt (Feb. 1, 2016 text entry).  Fujian initially proposed depositing the lower amount of $1,394,162.37, which represented the combined total of OWFE's two invoices to Fujian with respect to the refueling of the ZHENG RUN and the ZHENG RONG plus 6% interest to cover the first year.  *See* Proposed Deposit Order, Dkt. 6-1 at 1.  The principal invoice amount plus 6% interest is the amount that the Court typically required vessel interests to deposit in the O.W. interpleader cases.  *See, e.g.*, Deposit Order, 15-CV-8084, Dkt. 9 at 1-2 (S.D.N.Y. Oct. 19, 2015); Deposit Order, 15-CV-8304, Dkt. 9 at 1-2 (S.D.N.Y. Oct. 22, 2015).

In this matter, Fujian agreed to deposit a larger amount to act not only as the interpleader fund in this action but also to act as security so that the vessel that had been attached in the Louisiana Action would be released, as pertaining to ING's claims with respect to the ZHENG RUN and the ZHENG RONG.[45]  *See* Hearing Tr., Dkt. 16 at 9 (agreeing to deposit in this Court's registry a greater amount to cover security in the Louisiana Action); Order, 16-CV-0007,

---

[44]      For the reasons discussed in note 4 *supra*, Fujian is not entitled to discharge from liability for any claims asserted by the non-appearing Defendants or to a permanent injunction against them.  Fujian has not filed proof of service as to those Defendants or moved for an order to show cause why a default judgment should not be entered against them.  Accordingly, the Court takes no position as to their claims against Fujian or the vessels.

[45]      The vessel that was attached in the Louisiana Action provided security for unpaid invoices relating to the fueling of five vessels allegedly owned or controlled by Fujian, including the ZHENG RUN and the ZHENG RONG.  Louisiana Action Compl. at 2–3.  As explained *supra*, Judge Brown in Louisiana accepted Fujian's deposit of $1,972,392.60 in this Court's registry as sufficient security for ING's claims related to the ZHENG RUN and the ZHENG RONG, *see* Order, 16-CV-0007, Dkt. 35 at 2–3 (E.D. La. Feb. 1, 2016), and later transferred ING's *in rem* claims against those two vessels to the Southern District of New York, *see* Order & Op., 16-CV-0007, Dkt. 58 (E.D. La. July 27, 2016).

Dkt. 35 at 2–3 (E.D. La. Feb. 1, 2016) (permitting Fujian to deposit the greater amount in this

Court's registry to act as security in the Louisiana Action); *see also* Fujian Mem. of Law, Dkt. 69

at 11 ("[I]n order to effectively transfer ING and [GET's] claims related to the Zheng Run and

the Zheng Rong from the scope of the Louisiana alter-ego attachment action and to satisfy ING's

alleged right to security for those claims, on February 2, 2016 [Fujian] deposited a total of 150%

of the two invoices at issue, totaling $1,972,392.60.").

     Because Fujian deposited the amount required to release the vessel in Louisiana, the total

deposited amount constituted what ING claimed it was owed in the Louisiana Action with

respect to the two vessels at issue in this case.  Accordingly, as discussed in the Louisiana

Action, the deposited amount includes the following components:

| Vessel | Item | Amount |
|---|---|---|
| **ZHENG RUN** | OWFE's Invoice Issued to Fujian[46] | $408,651.28 |
| | Accrued Interest under OWFE Contract with Fujian between the Invoice Date and the Date the Louisiana Action Was Filed[47] | $161,825.91 |
| | Administrative Fees for Refueling under OWFE's Contract with Fujian[48] | $1,026.76 |
| **ZHENG RONG** | OWFE's Invoice Issued to Fujian[49] | $906,596.24 |
| | Accrued Interest under OWFE Contract with Fujian between the Invoice Date and the Date the Louisiana Action Was Filed[50] | $359,918.71 |
| | Administrative Fees for Refueling under OWFE's Contract with Fujian[51] | $2,728.84 |
| **Other** | ING's Estimated Attorneys' Fees in the Louisiana Action[52] | $20,000.00 |
| | Six Percent of the Total Amount as Interest for One Year | $111,644.86 |
| **Total** | | **$1,972,392.60** |

ING does not claim that it is entitled to those component parts were it to prevail in this interpleader action.  ING instead argues that it is entitled to judgment in the amount of the two invoices ($1,315,247.52) plus prejudgment interest at OWFE's contractual rate for the period between the invoice due dates and the filing of this interpleader action.  *See* Not. of Motion, Dkt. 71 at 1; ING Mem. of Law, Dkt. 73 at 1, 15.  Fujian argues that it is entitled to the balance of the deposited funds "over and about the amount of the relevant invoices" and "its costs and fees

---

[46]     *See* Stip. Facts, Dkt. 62 ¶ 17.

[47]     Louisiana Action Compl., Dkt. 9-2 ¶¶ 26, 72; ING Br., 16-CV-0007, Dkt. 17 at 15–16 (E.D. La. Jan. 26, 2016) (further explaining how the interest was calculated).

[48]     Louisiana Action Compl., Dkt. 9-2 ¶¶ 26, 72; ING Br., 16-CV-0007, Dkt. 17 at 16 (E.D. La. Jan. 26, 2016) (further explaining how the administrative fees were calculated).

[49]     *See* Stip. Facts, Dkt; 62 ¶ 51.

[50]     Louisiana Action Compl., Dkt. 9-2 ¶¶ 34, 72; ING Br., 16-CV-0007, Dkt. 17 at 15–16 (E.D. La. Jan. 26, 2016).

[51]     Louisiana Action Compl., Dkt. 9-2 ¶¶ 34, 72; ING Br., 16-CV-0007, Dkt. 17 at 16 (E.D. La. Jan. 26, 2016).

[52]     Louisiana Action Compl., Dkt. 9-2 ¶¶ 27, 35; *id.* ¶ 72 (listing $50,000 in attorneys' fees for the five ships at issue in the Louisiana action, at $10,000 per ship).

incurred in filing and conducting these proceedings." Not. of Motion, Dkt. 68 at 2; Fujian Mem. of Law, Dkt. 69 at 1.

### B.  The Invoice Amounts

Because ING is entitled to judgment on its claims, GET is not entitled to judgment on its claims, and Fujian "admitted liability on payment of the O.W. Far East invoices," *see* Fujian Mem. of Law, Dkt. 69 at 11–12, ING is entitled to the two principal invoice amounts, totaling $1,315,247.52.  Accordingly, ING's request for a judgment that includes the principal amount of $1,315,247.52 is granted.

### C.  Prejudgment Interest

ING has also moved for prejudgment interest at OWFE's contractual rate (3% per month), or, if the Court declines to award prejudgment interest at the contract rate, then at the prime rate, running from the due date of the respective invoices through the payment of any judgment.  *See* ING Mem. of Law, Dkt. 73 at 15.  Because different legal standards apply to pre-filing interest, which runs from the invoice due dates to the date the action was filed, and post-filing interest, which runs from the date the action was filed through the date of judgment, the Court considers pre-filing and post-filing interest separately.

#### 1.  Pre-Filing Interest

"Whether to order a party to deposit pre-filing interest in interpleader actions is 'firmly' within the discretion of the court." *Clearlake Shipping PTE Ltd. v. O.W. Bunker (Switzerland) SA*, No. 14-CV-10091, 2017 WL 892342, at *7 (S.D.N.Y. Mar. 3, 2017) (quoting *A & E Television Networks, LLC v. Pivot Point Ent., LLC*, 771 F. Supp. 2d 296, 303 (S.D.N.Y. 2011)). "An award of pre-filing interest is typically appropriate when the plaintiff has unreasonably delayed instituting the proceeding." *Id.* at *7 (citing *Avant Petroleum, Inc. v. Banque Paribas*, 652 F. Supp. 542, 544 (S.D.N.Y. 1987)).

Fujian argues that it did not unreasonably delay filing this action.  Even though this

action "was filed approximately one year after many of the other actions heard by the Court,"

Fujian asserts that it "acted reasonably to attempt to determine the outcomes of the other

interpleader filings in this District to determine if such a filing was a viable way to protect itself

from double liability."  Fujian Mem. of Law, Dkt. 69 at 17.  The Court does not find that

argument persuasive.  Nothing special occurred in or around January 2016 with respect to the

other O.W.-related interpleader actions that could have triggered a eureka moment by Fujian.

None of the other O.W.-related interpleader cases had been resolved at that point, and, as ING

points out, the Court had not even selected its "test" cases, let alone resolved them.  ING Resp.,

Dkt. 85 at 12.

As Fujian admits, it filed this interpleader action when one of its vessels was seized in

Louisiana and after GET filed a competing claim in Singapore.  *See* Fujian Mem. of Law, Dkt.

69 at 4; Fujian Reply, Dkt. 90 at 7.  Essentially, Fujian sat on the sidelines and did nothing for

more than a year knowing that it owed over a million dollars in unpaid invoices.  It is of no

moment that Fujian did not know whom to pay; Fujian clearly knew that the bunkers had not

been a gift and that it had to pay someone.

The Court finds that Fujian's decision to sit on its obligation for over a year constitutes

unreasonable delay, and, therefore, ING is entitled to pre-filing interest.

### 2.  Post-Filing Interest

ING is not, however, entitled to post-filing interest from Fujian.  "The deposit of the

disputed funds into the Court's registry cuts off any claim to prejudgment interest by the

defendant-claimants because depositing the funds is functionally the equivalent of tendering

payment of the disputed amount."  *Clearlake Shipping PTE Ltd.*, 2017 WL 892342, at *7

(collecting cases).  *See also id.* ("[B]ecause interpleader proceedings may delay payment while

the Court resolves the defendants' competing claims, demanding that the stakeholder pay interest would effectively penalize the plaintiff for resorting to the interpleader remedy and peg the cost of doing so to the parties' litigation strategies.").

ING would have been entitled to post-filing interest from the Court had the funds been deposited in the Court's interest-bearing account, known as the Court Registry Investment System ("CRIS").  *See Clearlake Shipping PTE Ltd.*, 2017 WL 892342, at *7 (noting that "the [interpleader] funds may be invested while on deposit with the Court and the proceeds of those investments will accrue to the successful claimant" (internal citation omitted)).  The Deposit Order in this case, as proposed by Fujian, only required Fujian to make "a deposit into the registry of this Court," *see* Deposit Order, Dkt. 12 at 1, and did not require that the funds be placed in CRIS.[53]  Had any party moved for the deposited funds to be placed in CRIS, the Court would have granted that motion.  Because the funds did not accrue interest, there is nothing to award ING.

In short, ING is not entitled to post-filing interest.

### 3.  The Amount of Prejudgment Interest

ING argues that it should be awarded prejudgment interest at OWFE's contract rate, but, if the Court determines that rate is inappropriate, then at the prime rate.  ING Mem. of Law, Dkt. 73 at 15.  As ING acknowledges, the Court has previously held that ING was not entitled to prejudgment interest at O.W.'s contract rate.  ING Mem. of Law, Dkt. 73 at 14 (citing *Clearlake Shipping PTE Ltd.*, 2017 WL 892342, at *7); ING Resp., Dkt. 85 at 11 (same).  The Court sees no reason to revisit that decision.  ING argues that other courts have awarded the average prime

---

[53]       In 2018, the Southern District of New York amended its Local Rules so that, by default, interpleader funds are deposited into an interest-bearing account.  *See* Local Rule 67.1(c); 2018 Committee Note to Local Rule 67.1(c).  Because the funds at issue were deposited in 2016, they were not automatically deposited in CRIS.

rate of interest in similar cases.  *See* ING Mem. of Law, Dkt. 73 at 14–15 (collecting cases).

ING has calculated the interest due at the average prime interest for the period between the

invoice due dates and the filing of this interpleader action at $50,276.33.  ING Resp., Dkt. 85 at

12.  In an exercise of its discretion, the Court finds that the average prime rate of interest is

appropriate to compensate ING for Fujian's delay in filing this action.

Accordingly, the Court awards ING $50,276.33 in prejudgment interest.

### D.  Fujian's Attorneys' Fees and Costs

Fujian has requested that the Court award it the attorneys' fees and costs it incurred in

filing and conducting these proceedings.  Not. of Motion, Dkt. 68 at 2; Fujian Mem. of Law, Dkt.

69 at 1.  "To assess fees and costs in favor of the stakeholder, a court of equity must find that (1)

a disinterested stakeholder, (2) who had conceded liability, (3) has deposited the disputed funds

into court, and (4) has sought a discharge from liability."  *Septembertide Pub., B.V. v. Stein &*

*Day, Inc.*, 884 F.2d 675, 683 (2d Cir. 1989).  Fujian has met each of those criteria: it is

disinterested in which party ultimately prevails; it conceded liability on the invoice amounts; it

deposited the funds; and it moved for discharge.

The Court previously found in separate O.W.-related actions that "the Vessel Interests

may recover their fees and expenses in connection with four aspects of these cases: (i) the

initiation of the interpleader actions; (ii) litigation regarding subject matter jurisdiction; (iii)

[litigation regarding] the discharge of the Plaintiff-Interpleaders; and (iv) their participation in

the discovery process as a disinterested stakeholder."  *Clearlake Shipping PTE Ltd. v. O.W.*

*Bunker (Switzerland) SA*, No. 14-CV-10091, 2017 WL 8772605, at *2 (S.D.N.Y. Dec. 12, 2017);

*see also Clearlake Shipping PTE Ltd.*, 2017 WL 892342, at *10 (reviewing caselaw on recovery

of attorneys' fees in interpleader actions).  Although Fujian has not made an application for a

specific dollar amount of fees and costs, or submitted supporting documentation, as the Court has

previously found, "it is appropriate at this stage for the Court to conclude that the Vessel Interest[] that [is] currently entitled to be discharged [is] also entitled to recover some measure of fees, subject to a proper motion under Rule 54 to fix the amount of the award." *Clearlake Shipping PTE Ltd.*, 2017 WL 892342, at *9.

Accordingly, Fujian is entitled to the attorneys' fees and costs that fall within the four categories outlined above, as discussed in the two *Clearlake* decisions. The Court will not go chapter and verse through the various types of fees Fujian believes fall under those four categories. *See* Fujian Mem. of Law, Dkt. 69 at 14–16. Suffice it to say that some of the fees requested, like those "incurred [] in assessing the basis of ING's Louisiana attachment action," *see id.* at 14, fall outside those categories.[54] The Court encourages ING and Fujian to meet and confer to try and reach an agreement on the amount of compensable attorneys' fees and costs; if the parties are unable to reach an agreement, then Fujian is welcome to file a motion pursuant to Rule 54 to fix the amount of fees and costs. Any such application must include supporting documentation regarding the tasks completed by each attorney, each attorney's level of seniority, the time spent on each task, and the attorney's billable hourly rate. The Court reminds Fujian that it will only award *reasonable* fees.

Fujian's attorneys' fees and costs will be paid from the interpleader fund. *See Clearlake Shipping PTE Ltd.*, 2017 WL 8772605, at *2 ("Absent special circumstances, the interpleader-plaintiff's attorney's fees are generally charged against the interpleader fund." (internal citation omitted)). In this matter, the Court construes the interpleader fund to be $1,394,162.37, the amount Fujian would have deposited but for its decision to increase the amount of funds on deposit to cover both the interpleader stake in this action and to serve as security to release the

---

[54] But Fujian's participation in the January 20, 2016, hearing before the Undersigned clearly does relate to the question of whether this Court had jurisdiction over Fujian's interpleader action.

vessel that was attached in the Louisiana Action.  Accordingly, any award of attorneys' fees and costs will come from the portion of the deposited funds allocated to ING.

In short, although the Court finds that Fujian is entitled to fees and costs from the interpleader fund, Fujian's application for fees and costs is denied without prejudice to the development of a more complete record.

### E.  Ultimate Allocation Between ING and Fujian

In sum, ING is entitled to $1,315,247.52 (the invoice amounts) plus $50,276.33 (prejudgment interest) minus the attorneys' fees and costs to be awarded to Fujian following either the parties' agreement on that issue or the Court's resolution of a new fee application. Fujian is entitled to $606,868.75, the remaining amount on deposit, plus the attorneys' fees and costs that ultimately will be awarded.  The Court will abstain from ordering any funds to be disbursed at this juncture, pending resolution of the attorneys' fees and costs issue.

## CONCLUSION

For the foregoing reasons, ING's motion for summary judgment is GRANTED and GET's motion for summary judgment is DENIED.  Fujian's motion to be discharged from liability to ING and GET for claims arising out of or relating to the subject bunker transactions is GRANTED and the preliminary injunction at docket entry 13 is made PERMANENT as against ING and GET.  Fujian's request for attorneys' fees and costs is DENIED without prejudice.

By no later than **Friday, April 15, 2022**, ING and Fujian must file a joint letter discussing the prospect of reaching agreement on the amount of attorneys' fees and costs due to Fujian.  If the parties would like a referral to the Magistrate Judge for a settlement conference on the issue of fees and costs, they may submit a joint letter requesting a referral at any time.

The Clerk of Court is respectfully directed to enter judgment in favor of ING Bank N.V. and against Global Energy Trading Pte Ltd.  The Clerk is further directed to terminate Global Energy Trading Pte Ltd. as a party in this action and to close the open motions at docket entries 66, 68, and 71.


**SO ORDERED.**

**Date:  March 28, 2022**
**        New York, NY**

_____
**VALERIE CAPRONI**
**United States District Judge**